Daniel R. Suhr (WI No. 1056658)*
Brian K. Kelsey (TN No. 022874)*
Liberty Justice Center
190 S. LaSalle Street, Suite 1500
Chicago, Illinois 60603
Ph.: 312/263-7668
Email: dsuhr@libertyjusticecenter.org
    bkelsey@libertyjusticecenter.org
*Lead Counsel for Plaintiff*

Anita Y. Milanovich (Mt. No. 12176)
MILANOVICH LAW, PLLC
100 E. Broadway Street
The Berkeley Room
Butte, Montana 59701
Ph.: 406/589-6856
Email: aymilanovich@milanovichlaw.com
*Local Counsel for Plaintiff*

*Admitted pro hac vice

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| **ILLINOIS OPPORTUNITY PROJECT**, | |
| Plaintiff, | Case No. 6:19-cv-00056-CCL |
| v. | RESPONSE TO DEFENDANTS' MOTION TO DISMISS |
| **STEVE BULLOCK**, in his official capacity as governor of Montana, and **MEGHAN HOLMLUND**, in her official capacity as chief of the State Procurement Bureau, | |
| Defendants. | |

# TABLE OF CONTENTS

Table of Authorities ........................................................................... 3

Introduction ....................................................................................... 4

Argument ........................................................................................... 8

    I.      The standard of review sets a high bar for dismissal. .................... 7

    II.     This court has subject-matter jurisdiction under Rule 12(b)(1). ..... 8

          a.  IOP is injured by the order's impact on its fundraising. ........... 9

          b.  IOP may assert the injury to its members' interests as well. ... 14

    III.    IOP has stated a claim on which relief can be granted. .............. 18

    IV.    No challenge from contractors has been forthcoming. ................. 24

Conclusion ....................................................................................... 25

# TABLE OF AUTHORITIES

CASES

*Allee v. Medrano*, 416 U.S. 802 (1974) ................................................................ 15

*Am. Fed'n. of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027 (9th Cir. 2007) ......... 9

*Ams. for Prosperity v. Grewal*, No. 3:19-cv-14228-BRM-LHG, 2019 U.S. Dist. LEXIS 170793 (D.N.J. Oct. 2, 2019) ......................................................... 7, 13, 18

*Bates v. City of Little Rock*, 361 U.S. 516 (1959) ................................................... 16

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................................................. 14, 25

*Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) ................................................. 15

*Church of Scientology v. Cazares*, 638 F.2d 1272 (5th Cir. 1981) ........................ 16

*Citizens Union of N.Y. v. AG of N.Y.*, No. 16-cv-9592, 2019 U.S. Dist. LEXIS 169438 (S.D.N.Y. Sep. 30, 2019) ................................................................... 17, 18

*DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117 (9th Cir. 2019) ................. 7

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ...................... 9

*Fair Hous. Council v. Roommate.com, LLC*, 666 F.3d 1216 (9th Cir. 2012) ....... 10

*Familias Unidas v. Briscoe*, 619 F.2d 391 (5th Cir. 1980) ..................................... 6

*Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886 (9th Cir. 2007) ........... 14

*Head v. Wilkie*, 936 F.3d 1007 (9th Cir. 2019) ....................................................... 8

*Illinois Opportunity Project v. Holden*, 3:19-cv-17912-BRM-LHG (D.N.J. Oct. 24, 2019) ...................................................................................................................... 19

*In re Anthem Data Breach Litig.*, 162 F. Supp. 3d 953 (N.D. Cal. 2016) ............. 24

*In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371 (Tex. 1998) .... 10

*Int'l Longshoremen's Asso. v. Waterfront Com.*, 667 F.2d 267 (2d Cir. 1981) .... 16

*Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ.*, Civil Action No. 18-12485-NMG, 2019 U.S. Dist. LEXIS 134852 (D. Mass. Aug. 9, 2019) ......................... 10

*La. ex rel. Gremillion v. NAACP*, 366 U.S. 293 (1961) ........................................ 15

*M.S. v. Brown*, 902 F.3d 1076 (9th Cir. 2018) ......................................................... 8

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ............................ 17, 25

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008)............ 19

*Minority Emps. of Tenn. Dep't of Emp't Secur., Inc. v. Tenn., Dep't of Emp't Sec.*, 573 F. Supp. 1346 (M.D. Tenn. 1983) .................................................................... 16

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ................. 6, 14, 15, 18

*NAACP v. Button*, 371 U.S. 415 (1963) ............................................................... 15

*Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994) ........ 16

*Nat'l Fed'n of Republican Assemblies v. United States*, 218 F. Supp. 2d 1300 (S.D. Ala. 2002) ............................................................................................................... 10

*Nat'l Taxpayers Union v. United States*, 68 F.3d 1428 (D.C. Cir. 1995)............... 24

*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir. 1995) .. 10

*ProtectMarriage.com - Yes on 8 v. Bowen*, 752 F.3d 827 (9th Cir. 2014) ....... 21-23

*Socialist Workers Party v. Attorney Gen.*, 463 F. Supp. 515 (S.D.N.Y. 1978) ..... 16

*Smith v. Bd. of Educ.*, 365 F.2d 770 (8th Cir. 1966).............................................. 16

*Steffel v. Thompson*, 415 U. S. 452 (1974) ............................................................. 9

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........................................ 8

*Tracht Gut, LLC v. L.A. Cty. Treasurer*, 836 F.3d 1146 (9th Cir. 2016) ............. 18

*Warth v. Seldin*, 422 U.S. 490, 511 (1975)............................................................ 15

*Zimmerman v. City of Austin*, 881 F.3d 378 (5th Cir. 2018) ................................. 23

NEWS SOURCES

Brian Montopoli, "Target Boycott Movement Grows Following Donation," CBSNews.com (July 28, 2010), https://www.cbsnews.com/news/target-boycott-movement-grows-following-donation-to-support-antigay-candidate/ .................. 11

Emily Friendman, "Target, Best Buy Angers Gay Customers By Making Contribution to GOP Candidate," ABCNews.com (July 28, 2010),

https://abcnews.go.com/Business/target-best-buy-fire-campaign-contributions-minnesota-candidate/story?id=11270194 ............................................................... 11

Jennifer Martinez and Tom Hamburger, "Target feels backlash from shareholders," L.A. Times (Aug. 10, 2010), https://www.latimes.com/archives/la-xpm-2010-aug-19-la-na-target-shareholders-20100820-story.html ................................................ 11

Katie Rogers and Annie Karni, "Trump's Opponents Want to Name His Big Donors. His Supporters Say It's Harassment." N.Y. Times (Aug. 8, 2019), https://www.nytimes.com/2019/08/08/us/politics/trump-donors-joaquin-castro.html ................................................................................................................ 12

Maria Ganga, "Carrot firm's olive branch," L.A. Times (Oct. 9, 2008), https://www.latimes.com/archives/la-xpm-2008-oct-09-me-juice9-story.html .... 12

Matt Volz, "Montana tells contractors to report 'dark money' spending," Assoc. Press (June 8, 2018), https://apnews.com/ ........................................................... 14

Phil Drake, "Governor Bullock's order targets dark money spending," Great Falls Tribune (June 8, 2018), https://www.greatfallstribune.com/story/news/2018/06/08/montana-governors-executive-order-reveals-dark-money/685517002/ ................................................. 20

Rich Miller, "Question of the day," Illinois Capitol Fax (Sept. 13, 2019), https://capitolfax.com/2019/09/13/question-of-the-day-2943/ ............................. 20

**INTRODUCTION**

Nationwide, there is an effort in several states to force disclosure regimes upon issue-advocacy organizations because politicians don't like the speech of those groups. Imposing disclosure on them gives the politicians and their allies the information they need to intimidate, bully, and otherwise silence dissenting views that dare to challenge the politicians and entrenched interests. Governor Bullock's executive order is one instance of a politician finding creative ways to discover funding sources the government has no constitutional justification to know.

However, the First Amendment stands as a bulwark to protect Americans from these politicians' quest to coerce private information out of those who would question their policies. The last time politicians made a concerted effort to discover this kind of information, the U.S. Supreme Court vindicated the right of an advocacy organization to its privacy. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958).

Politicians are again seeking out this sensitive, private information, knowing there are those who will seize upon it to target, embarrass, and harass citizens and corporations that support issue-advocacy organizations. As a New Jersey federal district judge said last month in a similar case, we live in "a climate marked by the so-called cancel or call-out culture that has resulted in people losing employment, being ejected or driven out of restaurants while eating their meals; and where the

Internet removes any geographic barriers to cyber harassment of others." *Ams. for Prosperity v. Grewal*, No. 3:19-cv-14228-BRM-LHG, 2019 U.S. Dist. LEXIS 170793, at *61 (D.N.J. Oct. 2, 2019).

Plaintiff Illinois Opportunity Project ("IOP") brought this pre-enforcement challenge because its intended advocacy is threatened by the governor's order. IOP will be injured by this order, its members will be injured by this order, and it has stated a claim for ending this order. For those reasons, as set forth in detail below, the motion to dismiss should not be granted.

## ARGUMENT

### I. The standard of review sets a high bar for dismissal.

The U.S. Court of Appeals for the Ninth Circuit has recently restated the standard applicable to this case: "When reviewing a dismissal pursuant to Rule 12(b)(1) and 12(b)(6), we accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiff, the non-moving party. Dismissal is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (internal quotations and citations omitted). As will be demonstrated in this brief, it is far from beyond doubt that no set of facts justify IOP's case. Rather, IOP has alleged all the facts and arguments necessary to survive Rule 12(b)(1) and (6).

## II.     **This Court has subject matter jurisdiction under Rule 12(b)(1)**.

A court may only dismiss a claim under Rule 12(b)(1) if it lacks subject matter jurisdiction because the plaintiff fails to demonstrate constitutional standing under Article III. *Head v. Wilkie*, 936 F.3d 1007, 1012 n.4 (9th Cir. 2019). This Court has subject matter jurisdiction in this case because IOP has all of the prerequisites of Article III standing: it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *M.S. v. Brown*, 902 F.3d 1076, 1082-83 (9th Cir. 2018).

IOP will suffer an injury in fact without this Court's action in its favor. The U.S. Supreme Court has recognized that pre-enforcement challenges like this one are appropriate when a plaintiff "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). IOP here alleged in its Complaint an intention to engage in a course of conduct thoroughly affected with a constitutional interest, namely its free speech via issue advocacy mailings to Montana voters. (Compl., Doc. 1, ¶¶ 17-18.)

In such an instance, the case may proceed if the government's policy applies and would be enforced. *See Susan B. Anthony List*, 573 U.S. at 159. This requirement, too, is met here: the governor's order applies to the intended action

(undertaking it would trigger the disclosure requirements), and Defendant Holmlund oversees an entire bureau of bureaucrats charged with enforcing the order, and to that end they have developed training modules, policy manuals, and compliance templates, such that the expectation of enforcement is very real. (Compl., Doc. 1, ¶ 14.) "It is not necessary that petitioner first expose himself to actual [invasion of his privacy] to be entitled to challenge [an order] that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U. S. 452, 459 (1974).

The injury to IOP's constitutional rights happens on two levels: its own rights, and the rights of its donors who associate together to support it. This injury is directly traceable to the governor's order, which establishes a Montana enforcement policy requiring disclosure of issue-advocacy donations. (Compl. Ex. 1 at 4-5) A favorable decision from this Court enjoining that order will permit IOP to go forward with its planned activities without fear of repercussion or retaliation.

*A. IOP is injured by the order's impact on its fundraising.*

IOP itself is injured by the order because the order harms its ability to retain its current financial supporters and to recruit new contributors. "[A]n increased difficulty in recruiting [corporate] members qualifies as a 'concrete and demonstrable' injury." *Am. Fed'n. of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027, 1033 (9th Cir. 2007). *Accord E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ("[A]n organization that suffers a decreased amount of business and

lost revenues due to a government policy easily satisfies the 'injury in fact' standing requirement.") (internal quotations omitted); *Fair Hous. Council v. Roommate.com, LLC*, 666 F.3d 1216, 1225 (9th Cir. 2012) (Ikuta, J., concurring/dissenting) ("An action that invades an organization's interest in recruiting members, obtaining funding, or collecting dues clearly hinders that organization's ability to function, and is an injury for purposes of standing."); *Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ.*, Civil Action No. 18-12485-NMG, 2019 U.S. Dist. LEXIS 134852, at *11 (D. Mass. Aug. 9, 2019) ("impediments to the ability of the fraternities and sororities to raise money [and] recruit and maintain members is an actual and particularized injury to those organizations.").

IOP here will experience an increased difficulty in retaining and recruiting members and contributors due to the order. *See In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 379 (Tex. 1998) (forced disclosure prompts a reasonable fear that an organization will lose members); *Nat'l Fed'n of Republican Assemblies v. United States*, 218 F. Supp. 2d 1300, 1312 n.13 (S.D. Ala. 2002) ("It is not only reasonably likely but uncontroverted that the Assembly plaintiffs will lose contributions should they make disclosures under Section 527(j)."). *See also New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500-01 (10th Cir. 1995) (government policy on campaign expenditures affects campaign fundraising, such that "there is ... nothing speculative or uncertain about the harm to

Congressman Richardson's fund raising activities brought about by the limitations…").

IOP engages in advocacy around controversial public issues, and it will be substantially harder for it to recruit supporters if its corporate members will be exposed. Corporate government affairs officers who make these sorts of decisions will recall the examples of Target and Best Buy, which were subject to boycotts and brand damage when they gave money to a Chamber of Commerce affiliate that backed a candidate for governor in Minnesota who supported lower taxes and less regulation. That candidate also supported traditional marriage. When their donations became public, they were subject to substantial backlash from customers and shareholders and were forced to apologize. *See* Brian Montopoli, "Target Boycott Movement Grows Following Donation," CBSNews.com (July 28, 2010), https://www.cbsnews.com/news/target-boycott-movement-grows-following-donation-to-support-antigay-candidate/; Emily Friedman, "Target, Best Buy Angers Gay Customers By Making Contribution to GOP Candidate," ABCNews.com (July 28, 2010), https://abcnews.go.com/Business/target-best-buy-fire-campaign-contributions-minnesota-candidate/story?id=11270194; Jennifer Martinez and Tom Hamburger, "Target feels backlash from shareholders," L.A. Times (Aug. 10, 2010), https://www.latimes.com/archives/la-xpm-2010-aug-19-la-na-target-shareholders-20100820-story.html. In another instance, retailers were

protested for stocking carrots from a company whose owner donated to the Proposition 8 campaign in California. Maria Ganga, "Carrot firm's olive branch," L.A. Times (Oct. 9, 2008), https://www.latimes.com/archives/la-xpm-2008-oct-09-me-juice9-story.html. A Hyatt Hotel and a self-storage company were also targeted for boycotts based on their owners' donations on Proposition 8. *Id.* When a Texas congressman posted a list of 44 max-out donors to President Trump's campaign on Twitter, it generated angry actions against numerous businesses employing or owned by those donors. Katie Rogers and Annie Karni, "Trump's Opponents Want to Name His Big Donors. His Supporters Say It's Harassment." N.Y. Times (Aug. 8, 2019), https://www.nytimes.com/2019/08/08/us/politics/trump-donors-joaquin-castro.html.

Boycotts, protests, angry customers, bad news stories, and upset shareholders is a high price to pay for any company. Lost business from the State of Montana is also a high price to pay. Thus, if companies must choose between state contracts and the likelihood of a major headache, companies will forgo their donation to protect their brand and bid on the contracts. *See* Compl., Doc. 1., at ¶ 22. IOP's fundraising is made substantially harder by such a rule, and its donations will decline if its corporate members are forced to choose between lost business and lost privacy.

Disclosure will not only make harder IOP's fundraising in Montana, (*see* Compl., Doc. 1, at ¶ 19), but it will have a substantial effect on IOP's renewals and

recruitment among large national and multinational corporations that operate in multiple states. Illinois is home to 66 Fortune 500 companies' headquarters. The one multinational corporation to already disclose under the governor's order, Deloitte Consulting LLP, has a major presence in Chicago. If any of them gave money to IOP to support IOP's work in Illinois or elsewhere and also submitted a bid for a Montana state contract, they would be required to disclose that donation, even if it was intended to support issue advocacy in some other state.

As the national news stories cited above concerning Target and Best Buy made clear, these stories don't stay localized to one state, especially in an age of activists and the Internet. Defendants post these disclosures on the Internet for the world to see, (Compl., Doc. 1, at ¶ 14), such that an activist enraged about a corporation's activities in one state can easily find out about its donations through the website of another, and then act on it: "the Internet removes any geographic barriers to cyber harassment of others." *Grewal*, No. 3:19-cv-14228-BRM-LHG, 2019 U.S. Dist. LEXIS 170793, at *61. IOP is directly injured because it can only undertake its mission if its raises money to fund its operations, and its fundraising in Montana, in Illinois, and nationwide is made substantially harder by the order.

*B. IOP may assert the injury to its members' interests as well.*

In addition to its own standing, IOP has standing on behalf of its corporate members.[1] The U.S. Supreme Court has a well-developed doctrine of third-party associational standing that permits groups like IOP to assert the rights of their members and donors,[2] especially in cases involving the question of privacy versus disclosure. That doctrine largely began with *NAACP v. Alabama*, where the Court started by recognizing the general rule for standing and injury: "To limit the breadth of issues which must be dealt with in particular litigation, this Court has generally insisted that parties rely only on constitutional rights which are personal to themselves." *NAACP*, 357 U.S. at 459. This is the rule proffered by Defendants and their citation to *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 891 (9th Cir. 2007). (Br. Supporting Mot. to Dismiss, Doc. 20, at 8-9.)

---

[1] The governor's chief legal counsel, who is now special assistant attorney general on this case, estimated at the time that the new requirement would cover 500-600 contracts per year. Matt Volz, "Montana tells contractors to report 'dark money' spending," Assoc. Press (June 8, 2018), https://apnews.com/6d1fd83275224d04bf6857dd4ac87b70. Keeping in mind that multiple companies usually bid on a single contract, and that state agencies contract with companies in a wide variety of industries, the Order's broad sweep is clear.

[2] While IOP choses to use "members and donors" to describe those who contribute to it, the terminology is irrelevant: "Our past decisions have not drawn fine lines between contributors and members but have treated them interchangeably." *Buckley v. Valeo*, 424 U.S. 1, 66 (1976).

However, the Court in *NAACP* then carved out an exception to this general rule: "where constitutional rights of persons who are not immediately before the Court could not be effectively vindicated except through an appropriate representative before the Court." *Id*. The Court found that an association is an appropriate representative in coerced disclosure cases, because to force a plaintiff to step forward would be to undermine the very privacy right at issue.[3] *Id*. The Court went on to reiterate this associational standing exception in several subsequent cases. *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 55 (1974) ("an organization may have standing to assert that constitutional rights of its members be protected from governmentally compelled disclosure of their membership in the organization, and that absent a countervailing governmental interest, such information may not be compelled."). *Accord Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Allee v. Medrano*, 416 U.S. 802, 819 n.13 (1974); *NAACP v. Button*, 371 U.S. 415, 428 (1963); *La. ex*

---

[3] Although the NAACP was an out-of-state organization, headquartered in New York, the parties and Court all accepted as true that it had members in Alabama without requiring the NAACP to disclose the names of those Alabama members that gave it standing, since such disclosure would defeat the entire purpose of their privacy claim. But in their motion to dismiss, Defendants suggest the only way that the Plaintiff can show associational standing is by naming a company that supports it financially and bids on Montana state contracts. (Br. Supporting Mot. to Dismiss, Doc. 20, at 10.) Naming such a company would similarly defeat the entire purpose of the lawsuit.

*rel. Gremillion v. NAACP*, 366 U.S. 293, 296 (1961); *Bates v. City of Little Rock*, 361 U.S. 516, 523, n. 9 (1959).

Other courts have followed the Supreme Court on this point in similar situations involving unions, churches, trade associations, and political parties. *Int'l Longshoremen's Asso. v. Waterfront Com. of N.Y. Harbor*, 667 F.2d 267, 270 (2d Cir. 1981) ("To force the individual longshoremen contributors to assert their own rights of anonymity would defeat the purpose of the litigation, the Fund is for all practical purposes identical to its individual members that use it as a medium to effectuate the expression of their views, and the Fund would be adversely affected by the disclosure's alleged chilling effect."); *Church of Scientology v. Cazares*, 638 F.2d 1272, 1276-78 (5th Cir. 1981); *Smith v. Bd. of Educ.*, 365 F.2d 770, 777 (8th Cir. 1966) (teachers union); *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1529 (10th Cir. 1994); *Minority Emps. of Tenn. Dep't of Emp't Secur., Inc. v. Tenn., Dep't of Emp't Sec.*, 573 F. Supp. 1346, 1349 (M.D. Tenn. 1983) (as to declaratory and injunctive relief); *Socialist Workers Party v. Attorney Gen. of United States*, 463 F. Supp. 515, 525 (S.D.N.Y. 1978).

There is a particular interest in "a liberal evaluation of the requirement of standing" when, as here, there is "the possibility . . . of an element of deterrence, through fear of reprisal, when one makes his own assertion of constitutional rights." *Smith*, 365 F.2d at 777.

IOP has a real fear that its members will be injured by exposure of their association. (Compl., Doc. 1, at ¶ 22.)  As a federal district court held just weeks ago, "There is no question that public disclosure of donor identities burdens the First Amendment rights to free speech and free association." *Citizens Union of N.Y. v. AG of N.Y.*, No. 16-cv-9592, 2019 U.S. Dist. LEXIS 169438, at *30 (S.D.N.Y. Sep. 30, 2019).  A donor may have a variety of reasons for wishing anonymity; it may be "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995).  Whatever the motivation, public disclosure eliminates that anonymity and burdens the donor's First Amendment rights to speak and associate privately.  And as was demonstrated above, corporate donors have a particularly justified fear of retaliation and ostracism when they support issue advocacy groups.

As IOP stated multiple times in its complaint (Compl., Doc. 1, at ¶¶ 5, 23, 27, 28, 32), it brought suit here to assert both its own rights and the rights of its members and donors.  Under the well-established doctrine of third-party associational standing, which is especially important in a case like this involving the privacy of a membership list, this Court should recognize IOP's third-party standing.

### III. IOP has stated a claim for which relief can be granted.

IOP has stated a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). To succeed on a motion to dismiss under 12(b)(6), the defendants must demonstrate that the complaint "lack[s] a cognizable legal theory or . . . the absence of sufficient facts alleged under a cognizable legal theory." *Tracht Gut, LLC v. L.A. Cty. Treasurer & Tax Collector*, 836 F.3d 1146, 1151 (9th Cir. 2016). Defendants have demonstrated neither requirement here.

IOP has set forth a very straightforward and substantial legal theory in this case: that the executive order chills its First Amendment speech and association rights and those of its members by invading their privacy without a sufficient government interest. IOP has done so based on sixty years of U.S. Supreme Court doctrine, starting with *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). That line of precedent is alive and well today, such that within just the last six weeks federal judges in New Jersey and New York have struck down donor-disclosure laws targeting issue advocacy groups like IOP. *Citizens Union of N.Y.,* No. 16-cv-9592, 2019 U.S. Dist. LEXIS 169438; *Grewal*, No. 3:19-cv-14228-BRM-LHG, 2019 U.S. Dist. LEXIS 170793. This legal theory is more than cognizable;[4] it is compelling.

---

[4] Defendants also apparently recognized that Plaintiff had presented a cognizable legal theory, given that they dedicated a page of their brief supporting their motion to dismiss to a discussion of the merits of Plaintiff's claims. (Br. Supporting Mot. to Dismiss, Doc. 20, at 2-3.).

And IOP has alleged the facts in the complaint necessary to support that legal theory. IOP has stated in its Complaint that it intends to engage in issue advocacy in Montana, (Compl., Doc. 1, at ¶ 17-18),[5] and that it will raise money from Montana-based and national corporate donors to pay for that advocacy, (*id.* at ¶ 19). The court must credit those assertions. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1100 n.1 (9th Cir. 2008) ("In reviewing a motion to dismiss, we accept the alleged facts as true.").

Defendants over and over again question the complaint's assertions based on the fact that IOP is named the "Illinois Opportunity Project." First, IOP's name is meaningless for purposes of standing. What matters is the facts and intentions alleged to support the legal theory of the complaint. Second, though its name pays homage to its home state, IOP's interests are national in scope and increasingly so. IOP has filed a similar challenge in New Jersey, and a federal judge recently entered a preliminary injunction order protecting Plaintiff's rights without the defendants or judge even questioning Plaintiff's credibility or standing. *Illinois Opportunity Project v. Holden*, 3:19-cv-17912-BRM-LHG, Doc. 17 (D.N.J. Oct. 24, 2019) IOP is pursuing an aggressive, proactive strategy to protect its rights and the rights of its

---

[5] Contrary to Defendants' first footnote in their motion to dismiss brief, even if the executive order were struck down by this Court, Plaintiff could still engage in issue advocacy urging gubernatorial candidates to respect First Amendment speech and privacy rights and not to issue similar orders or pursue appeals of this Court's ruling.

supporters nationwide. IOP has adopted this strategy in part because of its experience seeing policies in one state often replicated in others.

In fact, Defendant Governor Bullock invited other governors and states to follow his lead in issuing this order. According to a news report at the time, "He said he hoped his executive order, touted as unique, would be picked up by other governors. 'I hope other states will join me in a similar effort as their citizens deserve no less.'" Phil Drake, "Governor Bullock's order targets dark money spending," Great Falls Tribune (June 8, 2018), https://www.greatfallstribune.com/story/news/2018/06/08/montana-governors-executive-order-reveals-dark-money/685517002/.

It should not be surprising, then, that an Illinois state senator has introduced a similar bill to create disclosure requirements for issue advocacy organizations. Senate Bill 2089, sponsored by Senator Don Harmon (D-Oak Park). And a prominent Illinois Capitol press corps reporter recently asked, "Should Illinois also require 501(c)(4) social welfare organizations to disclose their funding sources if they lobby?," citing legislation in another state. Rich Miller, "Question of the day," Illinois Capitol Fax (Sept. 13, 2019), https://capitolfax.com/2019/09/13/question-of-the-day-2943/.

IOP is resolved to fight the order in the public square as an issue advocate, to ensure that the next governor of Montana shows more respect for free speech and

privacy. IOP is taking a proactive approach to this issue in Montana, New Jersey, and other states because its concerns are not conjectural but are very timely and very real.

Finally, the three cases cited by Defendants do not vitiate Plaintiff's standing. (Br. Supporting Mot. to Dismiss, Doc. 20, at 12-13.) A fuller reading of the Ninth Circuit decision *ProtectMarriage.com - Yes on 8 v. Bowen*, 752 F.3d 827, 840 (9th Cir. 2014) *supports* IOP's argument that its case is not conjectural or speculative. The decision states that the Ninth Circuit "typically look[s] to three factors to assess whether a pre-enforcement challenge is ripe for review under Article III." *Id*. at 839 (internal quotations and citations omitted). Specifically,

> [w]e first consider whether the plaintiff articulates a concrete plan to violate the law. With regard to this prong, a general intent to violate a statute at some unknown date in the future is not sufficient, and the plaintiff must establish a plan that is more than hypothetical.

*Id*. This is the primary prong on which the ProtectMarriage.com plaintiffs failed. They "have not offered any information regarding when they may next support a campaign opposing same-sex marriage, what type of campaign they will support, where they will support it, what their involvement will entail, or whether their donors will likely face personal harassment." *Id*. at 840.

Here, IOP's intentions are different in every single respect to those of ProtectMarriage.com. IOP has identified a specific "when"—the November 2020 elections. (Compl., Doc. 1, at ¶¶ 15, 17.) It has identified a specific "who" on which

it intends to speak—the candidates for governor. (*Id.* at ¶ 17.) It has identified a specific "where"—statewide, since the governor's race is statewide. (*Id.*) It has identified a specific "how" to its involvement—mailings to thousands of Montana voters urging the candidates to respect the privacy for citizens who support free speech. (*Id.*) And it has a legitimate, reasonable fear that its corporate donors will face retaliation and harassment. (*Id.* at ¶ 21, and the examples cited above.)

For the second prong to a pre-enforcement challenge, "the plaintiff need not establish an actual threat of government prosecution. Rather, the plaintiff need only demonstrate that a threat of potential enforcement will cause him to self-censor, and not follow through with his concrete plan to engage in protected conduct." *ProtectMarriage.com - Yes on 8*, 752 F.3d at 839. IOP has demonstrated a threat of potential enforcement, given Defendant Holmlund and her team of procurement specialists and their materials and trainings to enforce this order. (Compl., Doc. 1, at ¶ 14.) Based on this threat of potential enforcement, IOP has stated that it is self-censoring its free speech. (*Id.* at ¶ 23.)

For the third prong, "we consider the history of past prosecution or enforcement under the statute.... [T]he government's active enforcement of a statute may render the plaintiff's fear of injury reasonable." *ProtectMarriage.com - Yes on 8*, 752 F.3d at 839. Again, IOP has shown the Procurement Bureau's active

administration of the statute, with trainings, templates, policy manuals, and a website disclosing currently complying entities.  (Compl., Doc. 1, at ¶¶ 13-14.)

The Ninth Circuit concluded its discussion of the three prongs by saying:

Weighing these factors, we will only conclude that a pre-enforcement action is ripe for judicial review if the alleged injury is reasonable and imminent, and not merely theoretically possible. A claim is not ripe where the asserted threat is wholly contingent on the occurrence of unforeseeable events, or where the plaintiffs do not confront a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.

*ProtectMarriage.com - Yes on 8*, 752 F.3d at 839. IOP, unlike plaintiffs in ProtectMarriage.com, has demonstrated a case that is not speculative or conjectural but ripe and reasonable. IOP's direct injury is reasonable: its fundraising in Montana and among national and international corporations is undermined by the order.  And IOP's associational injury is reasonable: its members will forgo donating to protect their privacy, or continue donating and face substantial consequences. These injuries are imminent: the election is less than one year away, and Defendants have not challenged the ripeness of the claim.  Nothing in this case is contingent on unforeseen events. Defendants have an order they have executed and administer, and IOP has a concrete issue-advocacy plan it will carry out but for the order.

The other two cases cited by Defendants are also inapposite. *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018) involved a challenge from a candidate who failed to demonstrate a reasonable likelihood that he would receive

at least 100 donations above a certain amount from outside the city's limits. IOP must only demonstrate a reasonable likelihood of a single company both donating to it and bidding on a Montana contract. It has shown such a likelihood based on its intentions to fundraise among companies in Montana and its current fundraising among national and multinational corporations. The other case, *National Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995), was judged on the higher standard for standing in tax cases. *Id*. ("the standing inquiry in tax cases is more restrictive than in other cases."). More importantly, though, none of the three cases focus on the *NAACP* line of cases on associational standing. IOP has demonstrated associational standing in Section I.B. of this Response, and has also shown in Section I.A. that its membership and revenues would decline based on the exposure of its members to public scrutiny. In sum, IOP has put forward a clear, serious legal theory and the concrete injuries, specific plans, and timely fears necessary to sustain its standing.

### IV. No challenge from contractors has been forthcoming.

Defendants' final argument is that a Montana company that contracts with the State could bring a challenge to the order. (Br. Supporting Mot. to Dismiss, Doc. 20, at 16.) That someone else could also bring suit against the order is hardly a reason to say that Plaintiff lacks standing to bring its own suit. *See In re Anthem Data Breach Litig.*, 162 F. Supp. 3d 953, 1011 (N.D. Cal. 2016) ("the mere fact that OPM

could also bring suit against BCBSA does not bar Plaintiffs from bringing suit as a third party beneficiary.").

Moreover, even Defendants' hypothetical contractor that brought a pre-enforcement challenge without disclosing to whom it intended to donate would face a substantial hindrance: it would be suing the governor and procurement director who are responsible for distributing major state contracts, contracts that are vital to their bottom line. Apparently, in the year since the order was issued, no company has thought their First Amendment rights are worth that downside. *See Buckley v. Valeo*, 424 U.S. 1, 293 (1976) (recognizing that compelled disclosure may lead to "threats, harassment, or reprisals from … Government officials"); *McIntyre*, 514 U.S. at 341 ("The decision in favor of anonymity may be motivated by fear of economic or official retaliation…"). Furthermore, though it would not be stating whom it would be supporting, the company would be admitting that it would be engaging in issue advocacy generally, which could be damaging to its brand or its standing with a governor who loathes "dark money."

## CONCLUSION

The Court should reject Defendants' motion. IOP is a national advocacy organization. It intends to engage in advocacy in Montana and to raise money to pay for that advocacy from Montana corporations. It already raises money from national and multinational corporations. Specific to Rule 12(b)(1), it has

demonstrated an injury-in-fact to its operations, and it will experience increased difficulty in recruiting and retaining members due to the order. It has also demonstrated third-party associational standing based on the injury to its members, who have "a sufficient realistic fear of negative repercussions that their intended contribution will be chilled." (Br. Supporting Mot. to Dismiss, Doc. 20, at 11.) As to Rule 12(b)(6), Plaintiff has shown a cognizable legal theory and alleged the facts necessary to sustain it.

For these reasons, this Court should deny Defendants' motion to dismiss under both 12(b)(1) and (12)(b)(6) and allow the parties to proceed to resolution on the merits.

Dated: November 13, 2019

Respectfully Submitted,

_/s/ Daniel R. Suhr_
Brian K. Kelsey (TN No. 022874)*
Daniel R. Suhr (WI No. 1056658)*
Liberty Justice Center
190 S. LaSalle Street, Suite 1500
Chicago, Illinois 60603
Ph.: 312/263-7668
Email:
    bkelsey@libertyjusticecenter.org
    dsuhr@libertyjusticecenter.org
_Lead Counsel for Plaintiff_

_/s/ Anita Y. Milanovich_
Anita Y. Milanovich (Mt. No. 12176)
MILANOVICH LAW, PLLC
100 E. Broadway Street
 The Berkeley Room
Butte, Montana 59701
Ph.: 406/589-6856
Email:
 aymilanovich@milanovichlaw.com
_Local Counsel for Plaintiff_

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing document was served on Defendants via CM/ECF electronic notice.

*/s/ Anita Y. Milanovich*
Anita Y. Milanovich